IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DRIVER OPPORTUNITY PARTNERS I LP,<br><br>Plaintiff,<br><br>-against-<br><br>CODORUS VALLEY BANCORP, INC.,<br><br>Defendant. | CASE NO. _____ |

## COMPLAINT

Plaintiff Driver Opportunity Partners I LP ("**Plaintiff**"), for its Complaint against defendant Codorus Valley Bancorp, Inc. (the "**Company**"), alleges on personal knowledge of Plaintiff with respect to its own actions, and upon information and belief as to all other matters, as follows:

## THE PARTIES

1. Plaintiff Driver Opportunity Partners I LP is a limited partnership organized and existing under the laws of the State of Delaware and has a principal place of business in New York, New York.

2. Defendant Codorus Valley Bancorp, Inc. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, and regularly conducts business at 105 Leader Heights Road, York, Pennsylvania.

## NATURE OF THE ACTION

3. This is an action pursuant to Section 1508 of the Pennsylvania Business Corporation Law (15 Pa.C.S. § 1508) to enforce Plaintiff's statutory right as a shareholder of a

Pennsylvania business corporation to inspect and examine the books and records of the corporation upon statement of a proper purpose for such inspection and examination.

4. Plaintiff brings this action because it has made a valid request to the Company to inspect certain corporate books and records in compliance with Section 1508 of the Pennsylvania Business Corporation Law, but the Company has refused to permit the requested inspection as required by the statute.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff is a Delaware limited partnership with its principal place of business in New York, New York, and the Company is a Pennsylvania corporation with its principal place of business in York, Pennsylvania. Furthermore, the amount in controversy, exclusive of interest and costs, exceed the sum or value of $75,000. *See Perilstein v. United Glass Corp.*, 213 F.R.D. 252, 253-54 (E.D. Pa. 2003) (in diversity suit by shareholders seeking order requiring corporation to make its books and records available for inspection, amount in controversy for purpose of subject-matter jurisdiction was based on value to be protected, *i.e.*, the value of shareholders' shares, and since that value was at least $2.5 million, the jurisdictional amount was satisfied); *see also Rockwell v. SCM Corp.*, 496 F.Supp. 1123, 1125 (S.D.N.Y. 1980) (holding that, in an action to enforce inspection rights, "the proper measure of the amount in controversy is the value of the plaintiff's shares"), *cited with approval by Carey v. Pennsylvania Enterprises, Inc.*, 876 F.2d 333, 337, n.12 (3d Cir. 1989).

6. Venue is proper in this district because the Company is located, resides, and/or does business in this district, and/or a substantial part of the events or omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(b), (c); 12 U.S.C. § 5564(f).

## FACTUAL BACKGROUND

### The Company and Plaintiff's Shareholdings

7. The Company is a bank holding company. PeoplesBank, A Codorus Valley Company (the "**Bank**"), is a wholly owned bank subsidiary of the Company and a Pennsylvania chartered bank that offers a full range of consumer, business, wealth management, and mortgage services in 26 full service branch locations throughout South Central Pennsylvania and Central Maryland.

8. The Company's common stock trades on the NASDAQ Global Market under the ticker "CVLY." As of March 15, 2022, the Company's market capitalization was approximately $214 million.

9. Plaintiff is the record holder and/or beneficial owner of 640,880 shares of the Company's common stock, which equates to approximately 6.8% of the Company's outstanding shares, making Plaintiff one of the Company's largest individual stockholders. Plaintiff's shareholdings are valued at more than $14 million based on the current market price as of the date of this filing.

### Egregious Mismanagement of Company Assets Has Been Recently Revealed

10. On April 7, 2020, the Company announced that it expected to suffer a loss of approximately $7.5 million on a single private loan made by the Bank in the principal amount of $8,040,000, and that the expected loss "resulted from alleged fraudulent activities believed to be perpetrated by one of" the borrowers.[1] This loss is equivalent to approximately *4% of shareholders' equity in the Company at the time (and also nearly 4% of the Company's current market capitalization)*.

---

3

11.     Although the Company reported that this staggering loss was the result of fraud—the loan was secured by a car (the "**Fake Ferrari**") that was purported to be a "1959 250 Ferrari Testa Rossa" worth "$45-50 million" but was, in fact, not a Ferrari at all but a replica that was sold for gross proceeds at auction of $209,000—Plaintiff believes that these losses resulted from Company management's failure to conduct basic due diligence before approving such a large loan, and that management's failure in this respect constitutes corporate waste and gross mismanagement of Company assets. If the Company was properly managed, any attempted fraud involving the Fake Ferrari would have been discovered long before the loan was even seriously considered by Company management, thereby preventing a multi-million loss of Company assets that, ultimately, will be borne by the Company's shareholders, including Plaintiff.

12.     Based on publicly available information, it appears that, in September 2019, the Bank loaned $8,040,000 to Richard Welkowitz and Stephen Gurba (the "**Defaulted Loan**") in order to allow Welkowitz and Gurba (or related business entities) to repay two prior loans made by the Bank (the "**Existing Loans**") for the ostensible purpose of allowing the borrowers to liquidate assets pledged as collateral for the Existing Loans. Upon information and belief, Welkowitz and Gurba were in default of the Existing Loans at the time the Bank made the Defaulted Loan.

13.     Upon information and belief, Company management failed to do the most basic due diligence prior to extending the Defaulted Loan. Perhaps the most egregious example of management's shortcomings in this respect is the fact that it failed to obtain its own independent appraisal of the Fake Ferrari, or otherwise attempt to verify that the Fake Ferrari was actually authentic, let alone worth $45-50 million as the borrowers claimed (which would have made it one of the most valuable vintage automobiles in the world), prior to agreeing to loan an additional $8

million to Welkowitz and Gurba. Instead, Company management apparently relied upon an appraisal provided by the borrowers themselves to support the value of the Fake Ferrari that was used to secure the Defaulted Loan.

14.  Welkowitz committed suicide in December 2019, which constituted an event of default of the Defaulted Loan. Soon thereafter, the Fake Ferrari was revealed to be a copy and put up for auction as a replica. The catalogue for the auction describes the Fake Ferrari as:

> Many Ferrari enthusiasts have desired to own one of the classic sports racers from the 1950s but have been priced out of the market for the last 40 some years. *Finished in the style of a 1959 Ferrari 250 Testa Rossa, this professionally built Barchetta* painted in Rosso Corsa has a V-12 engine with Electromotive engine controls, a manual transmission, 4-wheel Wilwood brakes and bright knock-off wire wheels with Michelin tires, which, together, all make for an incredible road car for today. Offered here is a modern interpretation of the vintage experience with usage of Ferrari components to fulfill the dream.
>
> . . .
>
> Considering the original 250 Testa Rossa race cars are valued by price guides in the $40 million to $50 million range, *this custom build can be purchased for a small fraction of the cost. Part of the Richard Welkowitz Estate Collection since the day it was built,* this Barchetta comes with service receipts, delivery receipts and inspection documents.[2]

(Emphasis added.)

15.  Upon information and belief, replacing the Existing Loans with the Defaulted Loan was part of a plan of "extend and pretend" by Company management to avoid recognizing impairment of the Existing Loans on the Company's accounting books, and constitutes mismanagement and potential breaches of fiduciary duty, as does the substitution of the Fake own appraisal of the Fake Ferrari, or even establish that it was, in fact, actually an authentic vintage

5

Ferrari, before agreeing to loan more than $8 million against it, constitutes corporate waste, gross mismanagement, and potential breaches of fiduciary duty.

16. The loss on the Defaulted Loan resulted in the Company reporting a net loss of approximately $3 million for the first quarter of 2020. In its earnings release for that quarter, the Company reported the following explanation from its Board Chairman:

> "Earnings for the first quarter 2020 were adversely affected primarily by a loss directly attributable to a single, large commercial lending relationship at PeoplesBank," stated Larry J. Miller, Chairman, President/CEO. "The commercial lending loss resulted from alleged fraudulent activities believed to be perpetrated by one of the obligors. As of March 31, 2020, the Company's outstanding credit exposure to this borrower was approximately $8 million, which was reduced by the expected loss of $7.5 million."

17. To date, the Company has not disclosed to its stockholders that its enormous losses from the Defaulted Loan were not only the result of fraud, but also the result of Company management's lack of due diligence and apparent abdication of applicable underwriting standards for a loan of this size, as described above.

**Plaintiff's Books and Records Demand**

18. On March 8, 2022, Plaintiff, in accordance with Section 1508(c) of the Pennsylvania Business Corporation Law ("**Section 1508**"), sent a written request to the Company to make available for inspection and examination certain of its corporate books and records relating to the Defaulted Loan and the process by which the Defaulted Loan was reviewed and approved by Company management ("**Plaintiff's Books and Records Demand**"). A true copy of Plaintiff's Books and Records Demand is annexed as **Exhibit A**.

19. As stated in Plaintiff's Books and Records Demand, the purposes for which Plaintiff seeks to inspect the Company's corporate books and records is to determine whether the Company is being managed properly in light of management's egregious failures in connection

6

with the Defaulted Loan. Specifically, the purpose of Plaintiff's Books and Records Demand is to allow Plaintiff to evaluate whether (i) the Existing Loans were past due or otherwise in arrears, (ii) the Defaulted Loan was made in compliance with the Bank's underwriting standards or guidelines, (iii) the Bank conducted proper due diligence prior to making the Defaulted Loan, such as obtaining its own independent appraisal of the Fake Ferrari or otherwise established that it was, in fact, an authentic Ferrari, (iv) the Defaulted Loan (and the associated underwriting process) represents and is endemic of fundamental weaknesses in the Company's, and the Bank's, loan underwriting process, ongoing credit review, and oversight by the Board; (v) management's failings in this respect constitute actionable claims for corporate waste and breaches of fiduciary duty, and (vi) Plaintiff should commence legal action to remedy management's failings.

20.   In light of the aforementioned proper purposes, Plaintiff's Books and Records Demand seeks the following corporate books and records:

1. All documents relating to the extension of credit (any such extension, including the Defaulted Loan, a "Welkowitz Loan") to Richard Welkowitz, Stephen Gurba and any related business entities, including without limitation Big Red Express Trucking LLC (together, the "Welkowitz Borrowers");

2. All documents relating to any review of any extension of credit to any Welkowitz Borrowers, including without limitation, any consideration of whether to review or downgrade any Welkowitz Loan, any consideration of whether any Welkowitz Loan was past due or not accruing interest or any consideration of whether to declare an event of default or non-payment with respect to any Welkowitz Loan;

3. All documents relating to any meetings of any loan, credit, risk or similar committee regarding any decision to approve a Welkowitz Loan;

4. All documents relating to the car alleged to be a "1959 Ferrari Testa Rossa" that served as collateral for a $8,040,000 loan (the "Ferrari Loan") made by the Bank to

7

      Richard Welkowitz and Stephen Gurba in September 2019, including without limitation, any appraisals, valuation reports or opinions or other documents expressing a view as to the value and/or authenticity of that car;

5. All documents relating to the credit and underwriting policies of the Corporation and the Bank, including without limitations, any documents regarding guidelines on credit exposure to a single borrower or group of borrowers, any documents regarding guidelines to refinancing or otherwise replacing existing loans that are in arrears with a new loan and any documents regarding underwriting standards guidelines for loans secured by automobiles;

6. All documents relating to or demonstrating the Bank's experience in making loans secured by classic, collectable, vintage and/or exotic cars; and

7. All documents relating to the approval of the Ferrari Loan, including without limitation, the minutes of any relevant meetings of any loan, credit, risk or similar committee.

(Exhibit A at pp.2-3.)

21. Under Pennsylvania law, Plaintiff has the right to demand and inspect the requested books and records to enable it to make its own determination as to whether the Company is being properly managed. *See, Zerbey v. J.H. Zerbey Newspapers, Inc.*, 560 A.2d 191, 198 (Pa. Super. Ct. 1989) (holding that seeking to determine whether a corporation "is being properly managed in a general sense" constitutes a proper purpose under Section 1508).

22. Plaintiff's request to inspect and examine certain of the Company's corporate books and records pursuant to Plaintiff's Books and Records Demand was and is proper and within the meaning of Section 1508, as it was and is reasonably related to Plaintiff's interest as a shareholder in the Company.

23. Plaintiff has fully complied with all of the statutory requirements under Section 1508 governing the form and manner of making its demand.

24. Plaintiff's Books and Records Demand was sent to Timothy Nieman, the Company's Corporate Secretary, on March 8, 2022, and received by Mr. Nieman on that same date.

**The Company's Refusal to Comply with Plaintiff's Books and Records Demand**

25. By letter dated March 15, 2022, the Company responded to Plaintiff's Books and Records Demand (the "**Company's Response**"). A true copy of the Company's Response is annexed as **Exhibit B**.

26. In the Company's Response, the Company acknowledged receipt of Plaintiff's Books and Records Demand, but refused to permit Plaintiff's requested inspection based solely on two purported grounds. First, the Company contends that Plaintiff's Books and Records Demand seeks documents outside the scope of Section 1508. Second, the Company disputes that Plaintiff's Books and Records Demand states a proper purpose as required by Section 1508. Based on the foregoing, the Company advised Plaintiff that it "will take no further action on the request at this time." (Exhibit B at p.2.)

27. To date, the Company has refused to permit Plaintiff's requested inspection of the corporate books and records sought by Plaintiff's Books and Records Demand.

28. Pursuant to Section 1508(c) of the Pennsylvania Business Corporation Law (15 Pa.C.S. § 1508), Plaintiff has the statutory right to enforce its rights by seeking an Order from this Court compelling the inspection and examination sought, since the inspection sought is for various proper purposes and fully consistent with Plaintiff's rights and duties as a shareholder of the Company.

WHEREFORE, Plaintiff demands that judgment be entered in its favor and against defendant Codorus Valley Bancorp, Inc. directing defendant to produce, or otherwise make

available for inspection, the corporate books and records identified in Plaintiff's Books and Records Demand dated March 8, 2022, to Plaintiff within ten (10) business days, and awarding such other and further relief as the Court deems appropriate.

          Respectfully submitted,

          CALDWELL & KEARNS, P.C.

By:  /S/ BRUCE GROSSMAN
     Thomas E. Brenner, Esquire
     Bruce Grossman, Esquire
     3631 N. Front Street
     Harrisburg, PA  17110
     tbrenner@cklegal.net
     bgrossman@cklegal.net
     (717) 934-4089
     (717) 934-4058

*Attorneys for plaintiff Driver Opportunity Partners I LP*